COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-207-CR

ERIC PAUL MICHAEL APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1) ON REMAND

------------

On original submission of this appeal, we affirmed the decision of the trial court and held that, historically, impeachment of a witness with prior inconsistent statements is always an attack on the character of the witness, thus allowing rehabilitative evidence of truthfulness under Texas Rules of Evidence 608(a).  
Michael v. State
, 173 S.W.3d 829, 833 (Tex. App.—Fort Worth 2005), 
vacated
, 235 S.W.3d 723 (Tex. Crim. App. 2007).  On Michael’s petition for discretionary review, the Texas Court of Criminal Appeals vacated our judgment and remanded the case to this court, holding that “the question for the trial judge is whether a reasonable juror would believe that a witness’s character for truthfulness has been attacked by cross-examination, evidence from other witnesses, or statements of counsel (
e.g
., during voir dire or opening statements).” 
Michael v. State
, 235 S.W.3d 723, 728 (Tex. Crim. App. 2007)

I. Evidence and Procedural History

A.  Background and the Incident

At the time of the alleged incident, the complainant, H.F., was spending the night in Michael’s home as a guest of his two daughters.  Later that night, Michael showed the girls a video tape called either “Banned From TV” or “Faces of Death,” each of which portrays “a compilation of filmed events in which people get hurt, die.”  Michael’s wife claimed that she stopped the playing of the video because of its content, even though she never looked at it and never heard it.  H.F. and Michael’s two daughters slept in a small guestroom on a pallet of sleeping bags. H.F. testified that she awoke at 1:00 a.m. to find Michael kneeling beside her and “touching himself.”  She testified that he was not wearing a shirt and that his shorts were pulled down.  She indicated that she had been sleeping on her right side but that Michael had rolled her over onto her back.  Michael then grabbed her hand and pulled it toward himself. She stated that he then moved to her feet, pulled down her shorts, and began licking her “vagina” [sic].  H.F. testified that when she said “vagina” she meant “female sexual organ.”  Michael did not say anything while this happened, and H.F. just lay there in shock.  She testified that after five or ten minutes he stopped, pulled up her shorts, said “thank you,” and left the room.

Later, Michael walked back into the room, and H.F. asked to call her mother.  Michael allowed her to place the phone call, but no one answered at her house.  Michael’s wife testified that she heard the noise related to the phone call and came out of her bedroom.  She said that Michael had been sleeping in a chair in the living room, as he did from time to time.  She asked H.F. if she were having trouble sleeping “having nightmares or something,” and offered to let H.F. sleep with her.  H.F. got into the bed with Michael’s wife but did not fall asleep.  Eventually, Michael got into bed on the opposite side of his wife.

H.F.’s mother arrived around 8:30 the next morning to pick her up, and H.F. was crying.  H.F. told her mother that she was homesick and had seen a scary movie.  H.F. did not tell anyone of this incident until several months later, when, after watching an episode of “The Practice,” she told her mother.  The next day, H.F.’s mother called Child Protective Services and took her daughter to the Grapevine police department, where they filed a report.  H.F. then gave a videotaped interview.  

Michael was subsequently indicted and tried for sexual assault and indecency with a child.  During cross-examination of H.F., Michael’s defense counsel brought out discrepancies between H.F.’s testimony at trial and the videotaped interview.  In rebuttal, the State called H.F.’s former second grade teacher to offer testimony as to H.F.’s character for truthfulness.  Michael’s defense counsel objected to this testimony on the grounds that H.F.’s character or credibility had not been attacked and that any testimony regarding her character for truthfulness would be improper “bolstering.”  The trial court overruled the objection and allowed the testimony of H.F.’s second grade teacher.  

Michael was subsequently convicted of count 1, sexual assault of a child under fourteen, and count 2, indecency with a child by exposure, and sentenced under count 1 to sixty years’ confinement and under count 2 to ten years’ confinement.  This appeal followed.  

B.  Cross-examination of H.F.

H.F. was called by the State and was subsequently questioned under cross-examination, in part, as follows:

[Defense Counsel]: Okay. Do you remember after you told your mom that you went and spoke with a lady about what had happened to you?  

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  Okay.  And do you remember her telling you before you started talking about this that there was a camera in the room?

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  Okay. And she told you that she was taping--

[H.F.]:  Yes.

[Defense Counsel]: -- the interview, right?  

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  Okay.  And do you remember her talking about how important it was to tell the truth?

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  And, in fact, she even asked you about -- she even gave examples?  

[H.F.]:  Yes.

[Defense Counsel]:  Okay.  What -- what would be a truth and what would be a lie?  

[H.F.]:  Yes.  

. . . . 

[Defense Counsel]: Do you remember what you told her?  

[H.F.]:  Yes ma’am.

[Defense Counsel]:  Okay.  When you were talking to her, did you tell her that you were laying on your left side and that [A.M.] and [J.M.] were on either side of you?
(footnote: 2)  

[H.F.]:  Yes, ma’am.  

[Defense Counsel]:  Okay.  In fact, she had some little dolls, --

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  -- right?  She had a female doll and a male doll?

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  Okay.  And she gave you the female doll and asked you to show her how you were laying?

[H.F.]:  Yes, ma’am.

[Defense Counsel]:  And you laid the doll on your left -- on its left side?

[H.F.]:  Yes.

. . . . 

[Defense Counsel]:  Okay.  And you -- you never said anything to her about being rolled over or anything else, did you?
(footnote: 3)  

[H.F.]:  I don’t think so, no.

. . . .

[Defense Counsel]:  And y’all’s feet were down toward the --

[H.F.]:  TV.

[Defense Counsel]:  TV hutch.  Okay.  And do you recall telling the -- the -- the lady that you spoke with that you -- you had -- you never moved off your left side?  

[H.F.]:  Yes, ma’am.   

. . . . 

[Defense Counsel]:  Okay.  And now, were you -- were you on your side when all this was going on?

[H.F.]:  I think he had rolled me onto my back.

[Defense Counsel]:  Okay.  But you didn’t say that when you were talking to the lady?

[H.F.]:  Right.

[Defense Counsel]:  Okay.  In fact, the lady asked you that question a couple of times, right?

[H.F.]:  I think so.

[Defense Counsel]:  Okay.  And all -- and every time you told her that, you stayed on your left side?

[H.F.]: Okay. Yes, ma’am.  

. . . .

[Defense Counsel]:  Okay.  Now, when you’re describing everything that has occurred to you, do you remember -- when you talked to the -- the investigator who did the tape --

[H.F.]:  Yes.  

[Defense Counsel]:  -- the lady there at CPS, okay, do you recall her asking you what Mr. Michael’s penis looked like?  

[H.F.]:  Yes, ma’am.  

[Defense Counsel]:  Okay.  Do you remember what you told her?

[H.F.]: Yes, ma’am.  

[Defense Counsel]:  Okay.  What was that?

[H.F.]:  I just told her it was sticking out like -- she asked me if it was sticking up or down or anything like that.  I just told her it was sticking out.  

[Defense Counsel]:  Okay.  She asked you two questions.  The first question was what it looked like.  Do you recall telling her it looked normal?  

[H.F.]:  Yes.  

[Defense Counsel]:  Okay.  Are you sure that you told her that it was sticking out?  

[H.F.]:  I think I told her it was sticking down.  

[Defense Counsel]:  That it was hanging down?  

[H.F.]:  Yes.  

[Defense Counsel]:  Okay.  So your statement a minute ago that it was sticking out was incorrect?

[H.F.]:  Yes, ma’am.  

. . . .

[Defense Counsel]:  Okay. And she asked you -- do you remember her asking you the question about, well, how did this happen if your legs were here or here?  Do you recall that? 

[H.F.]:  Yes, ma’am.  

[Defense Counsel]:  Okay. And do you recall telling her that you -- you weren’t sure --

[H.F.]:  Yes.

[Defense Counsel]:  -- how that happened?

[H.F.]:  Yes.

[Defense Counsel]:  Because of the position that you were in?

[H.F.]:  Yes.  

[Defense Counsel]:  Okay.  And you weren’t sure?

[H.F.]:  Yes.

[Defense Counsel]:  Okay.  And -- and you again stated that you still didn’t see how he could have done what he did because the room was so small? 

[H.F.]:  Yes. 

 

[Defense Counsel]:  And you were on your left side?  

[H.F.]:  Right.  

C.  The Objection to Stacy Turner

As set forth in the Court of Criminal Appeals’s opinion, 

During rebuttal the State called Stacy Turner, H.F.’s former teacher and babysitter, to testify about her opinion as to H.F.’s character for truthfulness.  The trial defense counsel objected stating that the character of H.F. had not been attacked:

I don’t believe we have attacked the credibility of the child.  It’s a issue of dates.  It’s a fact.  It’s a fact issue for the jury.  It’s not a question of credibility.  We haven’t -- we haven’t brought the -- the child’s character in -- into question at all.  We -- merely state that it didn’t happen, and that’s -- that’s just -- that’s our defense.

In response, the State argued:

Oh, just for the record, Your Honor, for the appellate lawyers, defense counsel went at great length through the contents of the videotape with the victim indicating, well, you said this then and you’re saying this now.  That kind of testimony absolutely opens the door to rebuttal on grounds of truthfulness.  If that is the fact, regardless of what is said, it’s an attack on credibility.

Michael
, 235 S.W.3d at 725.

The objection was overruled, and Turner testified.

D.  Testimony of Stacey Turner

Turner testified that she was H.F.’s second grade teacher in 1998-1999 and that in December 1999, she had done some babysitting for H.F.  Turner testified, in part, as follows regarding the truthfulness of H.F.:

Q.  Do you have an opinion as to [H.F.’s] character for truthfulness and -- do you have an -- an opinion?

A.  Yes.

Q.  And is your opinion of her character for truthfulness good or bad?

A.  Good.

Q.  Thank you.

E.  Closing Argument

During closing argument, the prosecutor mentioned the testimony of Turner on a single occasion:

You can look at [H.F.].  You listened to her.  You listened to her mother.
  You listened to her second grade teacher
.  She is a well brought-up child.  She is a well-mannered child.  We even brought her school records.  If there was anything in there to indicate that she’s a liar, troublemaker, or a problem, it would be in there.  This is a well brought-up child who has no reason to lie and is not lying, and we have brought you every bit of information to show that she is credible and worthy of your trust and belief.  She is worthy of it.  And there were no witnesses from the defense  to say otherwise.

If she was a liar and a problem in the neighborhood, there would be witnesses here to describe her as such.  They are not here because she’s not a problem.  She is a truthful child.  So there’s no vindictiveness, no grudges, no lack of stability. [Emphasis supplied.]

II.  Standard of Review

An appellate court reviews a trial court’s decision to exclude or admit evidence under an abuse of discretion standard.  
Burden v. State
, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001); 
Green v. State
, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996), 
cert. denied
, 520 U.S. 1200 (1997); 
Montgomery v. State
, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990).  The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court’s action; rather, it is a question of whether the court acted without reference to any guiding rules or principles.  The mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate such an abuse.  
Montgomer
y, 810 S.W.2d at 391.  The trial court’s ruling will not be reversed on the admission of evidence as long as the ruling is within the zone of reasonable disagreement.  
Id
.

III.  Analysis 

Assuming, without deciding, that the trial court abused its discretion by allowing the testimony of Ms. Turner because a reasonable juror would not have believed that H.F.’s character for truthfulness had been attacked through her cross-examination, we turn to the harm analysis to determine whether the assumed error calls for reversal of the judgment. 

Under rule
 44.2, if the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to the appellant’s conviction or punishment.  
Tex. R. App. P.
 44.2(a).  Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect the appellant’s substantial rights.  
Tex. R. App. P.
 44.2(b); 
see Mosley v. State,
 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999); 
Coggeshall v. State
, 961 S.W.2d 639, 642-43 (Tex. App.—Fort Worth 1998, pet. ref’d).

Because the assumed error is not of constitutional dimension, rule 44.2(b) applies.  
See
 
Tex. R. App. P.
 44.2(b).  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. U.S.
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); 
Coggeshall,
 961 S.W.2d at 643. 

Our analysis is guided by the parameters set forth in
 
Schutz v. State
:

[N]either the State nor appellant must demonstrate harm when an error has occurred.  Rather, it is the appellate court’s duty to assess harm after a proper review of the record. . . . [T]he appellate court should consider everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence.  In addition, the appellate court may consider the trial court’s instructions to the jury, the theories of the case that the State and defendant have espoused, arguments to the jury and relevant voir dire.  This very process of evaluating the entire record to determine whether the error affected the jury’s verdict is the performance of a Rule 44.2(b) harm analysis. . . . [T]his is the state of the law and we reaffirm it today.

Schutz v. State
, 63 S.W.3d 442, 444-45 (Tex. Crim. App. 2001).

Evaluation of the record yields the following:

A.  Testimony

H.F. testified at trial at length that Michael came into the room, removed his shorts and exposed himself, and performed oral sex on her.  H.F. further testified that she was up at 1:30 a.m. and asked if she could “call [her] mom” because she “was scared that it would happen again.”  H.F. testified that she was “crying, and . . . was really upset” the next morning when her mom picked her up.  

H.F. further testified that she told the CPS investigator during a videotaped interview that Michael had licked her vagina, that he had exposed his penis to her with his pants down, and that he tried to get her to touch him.

Carl Coats, a detective for the Grapevine Police Department, testified that he was present in a separate room during the interview given by the CPS investigator and was “able to watch and able to hear the interview from a monitor.”

H.F.’s mother testified that H.F. had told her that “[H.F.] woke up, and [Michael] was licking her vagina.”  H.F.’s mother further testified that she “remember[ed] seeing a phone call [from Michael’s home] on the Caller ID on the telephone . . . between 1:30 and 2 in the morning.”  H.F.’s mother testified that she spoke with her daughter later that morning and “she just seemed upset.  She wanted me to come get her.”  H.F.’s mother testified that when she arrived, H.F. “ran to me and kind of clinged to me, a little bit sobbing.”

Araceli Desmarais, sexual assault nurse for Cook Children’s Medical Center, testified that H.F. stated to her that 

[H.F.] woke up, that [Michael] was licking her vagina. [H.F.] said he was trying to make her touch his penis, so she never touched it.  She stated that he was on his knees and was holding his shorts down, and I asked her if she had her clothes on or off.  She said that he had taken her shorts off, but then later put them on.

Michael testified at trial and denied all allegations against him and stated that “[he] didn’t commit no sexual acts.”  Michael testified that he did show the video “Banned from TV” to his daughters and H.F.  Michael further shifts the blame to his children for showing the video, as recounted in the following:

Q.  Okay.  And, in fact, sir, it was your idea to show this to a group of nine and then seven-year-olds?

A.  No, that’s not exactly how it went. [A.M.] was talking with [H.F.] “Hey, my dad’s got this tape?” [H.F.] turned around, “Mr. Michael, can I see that tape?”  She was so adamant to see this, bad judgment, I figured, you know, tough girl, yeah, sure, why not.  I just threw it in there.

Q.  So you’re saying that the showing of that tape was [H.F.’s] fault, that you have no responsibility for taking charge there with children?

A.  I didn’t say it was her fault.  It was her suggestion.

Michael also testified that H.F. was up at 1:30 a.m. asking to call her mother.

Michael’s wife also testified that “[H.F.] woke up, and she wanted to call her mother.”

B.  Closing Argument

The prosecutor reiterated during the closing argument that H.F. testified that “she woke up and [Michael was] over here [and] was licking her vagina. . . . She said he used his tongue, and that was his mouth.  She also told you that he exposed his penis and tried to touch it, and she pulled away.”  The prosecutor went on to clarify that H.F.’s recantation of events is “the same story she told her mom . . . [s]ame story she told Detective Coats and the other police officer.  It’s the same story she told Araceli Desmarais from Cook’s Children . . . .  It’s the same story she told here.  It’s the same story she told the CPS worker.”

C.  The Result

Considering the repeated statements of H.F. about what occurred, the minimal testimony of Turner and solitary reference to the testimony, and a review as directed by 
Schutz v. State
, we conclude that, in the context of the entire case against Michael, the trial court’s assumed error in admitting the brief testimony of Turner did not have a substantial or injurious effect on the jury’s verdict and did not affect Michael’s substantial rights.  
See King
, 953 S.W.2d at 271.  Thus, we disregard the error and overrule Michael’s sole point.  
See
 
Tex. R. App. P.
 44.2(b).

IV.  Conclusion

Having overruled Michael’s sole point, we affirm the trial court’s judgment.

BOB MCCOY

JUSTICE

PANEL B: HOLMAN, GARDNER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: February 14, 2008

FOOTNOTES
1:
See
 
Tex. R. App. P. 47.4
.

2:
H.F. testified during direct examination that she had been sleeping on her right side. 

3:
H.F. testified during direct examination that Michael had rolled her over.